UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CR. NO. 1:22-CR-60 |
| | : | |
| v. | : | |
| | : | (Judge Rambo  ) |
| **RODNEY L. YENTZER**, | : | |
| | : | |
| Defendant. | : | |

# I N F O R M A T I O N

THE UNITED STATES ATTORNEY CHARGES:

At times material to this Information:

## COUNT 1
18 U.S.C. § 1349
(Conspiracy to Commit Health Care Fraud)

## BACKGROUND

1. The defendant, RODNEY L. YENTZER, was resident of
Carlisle, Pennsylvania, in the Middle District of Pennsylvania.

2.  Pain Medicine of York ("PMY") was a medical clinic located in
York, PA, in the Middle District of Pennsylvania. It was founded in or
around 2000 by a physician named S.L.

3. RODNEY L. YENTZER acquired PMY from S.L., with an
effective date in or around 2014. Prior to when he acquired PMY,

RODNEY L. YENTZER had no medical training and no experience operating or managing medical practices.

4. PMY was a medical practice specializing in pain management. Under RODNEY L. YENTZER's ownership, PMY also did business under the name All Better Wellness. PMY and All Better Wellness were providers enrolled with Medicare.

5. From about 2017 through 2019, a large percentage of PMY's patients received prescriptions for opioid medications at each visit. In order to receive refills of their prescription opioid medications, patients had to be seen in person by a medical provider each month.

6. PRACTICE GROUP 1 was a group of medical practices with locations in Altoona, Johnstown, State College, and other addresses in Pennsylvania and Maryland. Like PMY, PRACTICE GROUP 1 specialized in pain management and prescribed a large percentage of its patients opioid medications at each monthly visit.

7. PHYSICIAN 1 was a physician with specialized training in anesthesiology. PHYSICIAN 1 owned and operated PRACTICE GROUP 1 until about the middle of 2017. In or about July 2017, PHYSICIAN 1 was sentenced by a U.S. District Court to a multiyear term of

2

imprisonment for conspiracy to commit health care fraud and a federal tax offense. PHYSICIAN 1 had pleaded guilty to participating in a fraud scheme in which PHYSICIAN 1 received kickbacks in return for referring patients for drug testing and related laboratory work. PHYSICIAN 1 was also sentenced in a second U.S. District Court to a concurrent multiyear term of imprisonment for receiving illegal kickbacks for medically unnecessary prescriptions for compounded pain cream medications. PHYSICIAN 1 was ordered to pay more than $3 million in restitution to different agencies of the federal government for these offenses.

8. RODNEY L. YENTZER and PHYSICIAN 1 were friends and business associates. From the time of RODNEY L. YENTZER's acquisition of PMY until PHYSICIAN 1's imprisonment, PHYSICIAN 1 had influence over PMY's operations. Among other things, PHYSICIAN 1 provided direction to RODNEY L. YENTZER on clinical issues. PHYSICIAN 1 also reaped financial benefits directly from PMY.

9. Around early 2017, RODNEY L. YENTZER knew of PHYSICIAN 1's likely imprisonment and the reasons for it. All PRACTICE GROUP 1 operations were transitioned to PMY in 2017 as

3

PHYSICIAN 1 was preparing to be sentenced to prison. From this time forward, PMY encompassed both its original location in York, PA, as well as then remaining locations of PRACTICE GROUP 1 in Altoona, Johnstown, State College, and elsewhere.

10. RODNEY L. YENTZER exercised control over PMY either as the direct owner or, later, through a management company called Ilumina Life Management, LLC, of which RODNEY L. YENTZER was the sole member, president, treasurer, and secretary. Starting in or about June 2018, Ilumina Life Management had control of PMY pursuant to the terms of a written management agreement. RODNEY L. YENTZER also had control over Health Search, Inc., a company incorporated and owned by RODNEY L. YENTZER and his wife. Health Search was used to contract with and pay the medical providers who worked at PMY from about 2017 to 2019.

11. PMY CHIEF EXECUTIVE OFFICER became the CEO of Pain Medicine of York in or about January 2018. Prior to that, PMY CHIEF EXECUTIVE OFFICER served as Director of Operations of PRACTICE GROUP 1. PMY CHIEF EXECUTIVE OFFICER first assumed a leadership role at PMY when PRACTICE GROUP 1's operations were

4

transitioned to PMY in 2017. PMY CHIEF EXECUTIVE OFFICER had no medical training and no experience operating or managing medical practices prior to being appointed Director of Operations of PRACTICE GROUP 1. When PMY CHIEF EXECUTIVE OFFICER was promoted to the position of CEO, PMY CHIEF EXECUTIVE OFFICER's day-to-day responsibilities did not materially change.

12. On or about November 6, 2019, members of federal and Commonwealth of Pennsylvania law enforcement executed search warrants at PMY's various locations. Following this operation, PMY became unable to retain medical providers and therefore could no longer see patients. It ceased operations in or about December 2019.

13. In or about March 2020, RODNEY L. YENTZER resigned his role with PMY; however, he maintained control over the main PMY checking account even after his resignation.

_Medicare and Urine Drug Testing_

14. A "health care benefit program" is defined as "any public or private plan to contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service

5

for which payment may be made under the plan or contract." Title 18, United States Code, Section 24(b). In this case, the Medicare Program falls under the definition of a "health care benefit program."

15. The Medicare Program ("Medicare") is a federally funded health care program generally providing benefits to people aged 65 or older, younger people with disabilities, and people with end stage renal disease. Medicare is administered by the Centers for Medicare & Medicaid Services (CMS), a federal agency within the Department of Health and Human Services (HHS). Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

16. Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps to pay the cost of medically necessary physician office services, medical equipment and supplies, and other health services and supplies not paid by Part A.

17. Medicare also covers clinical laboratory services, including urine drug testing (UDT), under Part B. Physicians use UDT to detect the presence or absence of drugs or to identify specific drugs in urine samples. Drug testing is the process of using a biological sample—

6

usually urine or blood—to detect the presence or absence of a drug or its metabolites in the body. Generally, there are two types of drug testing services: (1) presumptive testing and (2) definitive testing. Presumptive drug testing provides a negative, positive, or numerical result indicating the presence or absence of drugs or drug classes. Definitive drug testing identifies specific medications, illicit substances, and metabolites and reports the results in concentrations of specific drugs within a drug class.

18. Medicare requires that drug testing services be ordered and testing results be used by the physician or qualified nonphysician practitioner who is treating the beneficiary. Clinical laboratories may provide drug testing services and submit Medicare Part B claims to one of the seven Medicare Administrative Contractors (MACs), based on jurisdiction, for those services. Medicare Administrative Contractors (MACs) process Medicare claims and develop Local Coverage Determinations (LCDs). An LCD is a coverage decision for a service or

item within a MAC's jurisdiction and made in accordance with section

1862(a)(1)(A) of the Social Security Act.

19. Novitas Solutions, Inc. (Novitas) is the MAC that administers

the Medicare Part B program for claims arising in the Commonwealth

of Pennsylvania. CMS contracts with Novitas to receive, adjudicate,

process, and pay certain Part B claims.

20. For presumptive drug testing services, laboratories use one of

three CPT11 codes (80305, 80306, and 80307), depending on the level of

complexity of the test. For definitive drug testing services, laboratories

use one of five Healthcare Common Procedure Coding System (HCPCS)

codes (G0480, G0481, G0482, G0483, and G0659), which generally are

dependent on the number of drug classes, including metabolites, that

are tested.

21. CMS requires individuals and entities, including clinics/group

practices, that wish to provide medical services to individuals enrolled

in Medicare to complete the CMS-855. By becoming a participating

provider in Medicare, enrolled providers agree to abide by the policies

and procedures, rules, and regulations governing reimbursement. To

receive Medicare funds, enrolled providers, together with their

authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers are given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

22. Health care providers may only submit claims to Medicare for medically reasonable and medically necessary services and supplies. Medicare defines "medically necessary" as health care services or supplies needed to diagnose or treat an illness, injury, condition, disease, or its symptoms and that meet accepted standards of medicine. Services must meet specific medical necessity requirements in the statute, regulations, manuals, and specific medical necessity criteria defined by National Coverage Determinations (NCDs) and LCDs, if any apply to the reported service.

23. Under Novitas LCD L35006 ("Controlled Substance Monitoring and Drugs of Abuse Testing"), "[t]reatment for patients on chronic opioid therapy (COT)" is considered one of the "Covered

Indications," or permissible purposes, for the use of urine drug testing.

UDT may also be used as part of treatment for opioid use disorder,

including for patients receiving SUBOXONE®. SUBOXONE® is a

prescription medicine combining buprenorphine and naloxone used to

treat adults who are addicted to or dependent on opioid drugs, whether

prescription or illegal. Buprenorphine works partially like an opioid,

but the effect is weaker than opioids such as heroin and methadone. It

also has a "ceiling effect," which reduces the risk of misuse, dependency,

and side effects. Buprenorphine lowers the effects of opioid withdrawal

symptoms and cravings, which helps people who take the medication

abstain from other opioids. Naloxone is a medicine that rapidly reverses

an opioid overdose.

24. When dealing with patients on chronic opioid therapy, LCD

L35006 states, "[a] physician who is writing prescriptions for

medications to treat chronic pain can manage a patient better if the

physician knows whether the patient is consuming another medication

or substance, which could suggest the possibility of [substance use

disorder] or lead to drug-drug interactions. Additionally, UDT may help

the physician monitor for medication adherence, efficacy, side effects,

10

and patient safety in general." In other words, drug testing on patients who regularly take opioid prescription medications can help to determine whether those patients are taking their medications appropriately, diverting their medications to other users, taking street drugs in addition to their prescription opioid medications, or are at risk of potentially dangerous drug interactions, among other things.

25. LCD L35006 also says that both presumptive and definitive UDT orders "should be individualized based on clinical history and risk assessment, and must be documented in the medical record." The medical necessity guidance says that "[c]riteria to establish medical necessity for drug testing must be based on patient-specific elements identified during the clinical assessment, and documented by the clinician in the patient's medical record and minimally include the following elements: Patient history, physical examination and previous laboratory findings; Current treatment plan; Prescribed medication(s); and Risk assessment plan."

26. LCD L35006 also specifies that a "blanket order" is a "[t]est request that is not for a specific patient; rather, it is an identical order for all patients in a clinician's practice without individualized decision

11

making at every visit." Blanket orders are listed in this LCD under

"Non-Covered Services." A non-covered service in medical billing means

one that is not covered by government and private payers, and under

Medicare that includes medically unreasonable and unnecessary

services and supplies.

27. The LCD defines "Reflex Testing" as "Laboratory testing that

is performed reflexively after initial test results to identify further

diagnostic information essential to patient care." The LCD's section on

Non-Covered Services states: "Reflex definitive UDT is not reasonable

and necessary when presumptive testing is performed at point of care

because the clinician may have sufficient information to manage the

patient. If the clinician is not satisfied, he/she must determine the

clinical appropriateness of and order specific subsequent definitive

testing (e.g., the patient admits to using a particular drug, or the IA

cut-off is set at such a point that is sufficiently low that the physician is

satisfied with the presumptive test result)."

28. The section on Non-Covered Services also states, "Routine

standing orders for all patients in a physician's practice are not

reasonable and necessary." A standing order is defined as a "[t]est

request for a specific patient representing repetitive testing to monitor a condition or disease for a limited number of sequential visits."

*Pennsylvania Medicaid and Urine Drug Testing*

29. Medicaid is a joint federal-state program that provides health coverage and/or nursing home coverage to certain categories of low-asset individuals, including children, pregnant women, parents of eligible children, people with disabilities and elderly needing nursing home care. Medicaid was created to help low-asset individuals who fall into one of these eligibility categories pay for some or all of their medical bills. CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards. Each state administers its own Medicaid program, establishes its own eligibility standards, determines the scope and types of services it will cover, and sets the rate of payment.

30. In Pennsylvania, the Department of Human Services (DHS) is the organization tasked with administering the Medicaid program. Managed Care Organizations (MCOs) contract with DHS to deliver Medicaid health benefits and additional services to Pennsylvania residents who are eligible recipients and are enrolled as members

13

within the MCO's network. DHS pays to the MCOs a monthly amount for every recipient. The MCOs then disburse Medicaid funds to the credentialed providers within their network based upon the claims a provider submits for services rendered.

31. MCOs also determine billing guidance and policies for credentialed Medicaid providers. As with Medicare, UDTs billed to Medicaid must be medically necessary. In Pennsylvania, this means in practice that providers must use UDT panels that are customized to individual patients and may not bill for both presumptive and definitive UDTs on the same date of service unless the results of the first test are interpreted prior to ordering the second test.

*HHS Stimulus Funds for COVID19 Relief*

32. In April 2020, HHS rolled out the Provider Relief Fund (PRF). PRF provides direct payments to eligible medical providers who have health care related expenses and lost revenues attributable to COVID19. In general, in order to be eligible for PRF funds, a provider must have billed Medicare fee-for-service in 2019, must be a known Medicaid and Children's Health Insurance Program or dental provider, and must provide or have provided after January 31, 2020 diagnoses,

14

testing, or care for individuals with possible or actual cases of COVID19. The first round of Phase 1 general distributions began on or about April 10, 2020 and were sent to entities that billed Medicare in 2019. If a provider received a payment of PRF funds and retained that payment for at least 90 days without contacting HHS regarding remittance of those funds, the provider was deemed to have accepted the terms and conditions imposed by HHS.

33. On or about April 10, 2020, PMY received approximately $191,424.07 in PRF funds for COVID19 relief.  RODNEY L. YENTZER obtained these funds through his control of the main PMY bank account—over which he still had control—and used them on various things unrelated to COVID19 relief, including personal expenses.


## STATUTORY ALLEGATION

34.  Paragraphs 1 through 33 are incorporated here.

35. From in or around 2016 until in or about December 2019, in York and Cumberland Counties, within the Middle District of Pennsylvania, and elsewhere, the defendant,

**RODNEY L. YENTZER**,

15

did knowingly conspire and agree, together and with other persons both known and unknown to the United States, to commit offenses against the United States and to defraud the United States, that is:

To knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347,

## MANNER AND MEANS OF THE CONSPIRACY

36. PHYSICIAN 1 told RODNEY L. YENTZER in or around 2016 that every patient of PMY would receive two urine drug tests—both a presumptive test and a definitive test—at every office monthly visit. PHYSICIAN 1 told RODNEY L. YENTZER that this practice would be necessary to make the business sufficiently profitable. Despite his lack of medical training, RODNEY L. YENTZER understood that the practice of administering two urine drug tests to each patient at every visit did not constitute individualized care. RODNEY L. YENTZER agreed to implement this practice.

16

37. PMY operated a drug testing laboratory that was collocated with its Altoona office location and was previously part of PRACTICE GROUP 1. PMY's practice was to send its patients' urine samples to its own testing lab for UDT, rather than to private clinical laboratory companies, whenever possible. As a result, PMY regularly received Medicare Part B payments for its patients' office visits and for their UDTs. From around mid-2017 to the end of 2019, PMY submitted claims for payment to Medicare totaling over $10 million just for UDTs. PMY also billed an MCO that contracted with Pennsylvania DHS for UDTs during this same time period.

38. From about 2016 to 2019, PMY had a relationship with a company that was responsible for submitting bills to medical insurance companies, including Medicare, on its behalf. This billing company kept data showing the number of UDTs that were submitted for payment broken down by procedure code.

39. From early 2017 to mid-2017, the number of UDTs—both presumptive and definitive—for which PMY sought payment from Medicare grew substantially. In March 2017, there were approximately 500 UDTs submitted for payment under procedure code 80307, the

17

highest-level and most expensive presumptive UDT; approximately 300 UDTs were submitted for payment under procedure code G0483, the highest-level and most expensive definitive UDT, which is comprised of a panel of tests for 22 or more classes of drugs. In August 2017, there were approximately 2,250 UDTs submitted for payment under procedure code 80307, and approximately 2,560 UDTs submitted for reimbursement under procedure code G0483.

40. Until about April 2019, G0483 was the only procedure code that PMY ever used for definitive tests. Over the course of PMY's relationship with the billing company, procedure code G0483 was used for approximately 92% of all definitive UDTs submitted to insurance companies, and procedure code 80307 was used for approximately 99.8% of all presumptive UDTs submitted to insurance companies.

41. Each test under procedure code 80307 was billed to Medicare for approximately $160 and, when covered, was paid at a rate of over $70. Each test under procedure code G0483 was billed to Medicare for approximately $500 and, when covered, was paid at a rate of over $240. From around mid-2017 through the end of 2019, PMY received Medicare payments for UDTs totaling over $4 million, a large portion of

18

which went to RODNEY L. YENTZER and PMY CHIEF EXECUTIVE
OFFICER.

42. RODNEY L. YENTZER regularly received funds from the
main PMY checking account, of which he was a signer. He also
regularly moved large amounts of funds from this account to a checking
account in the name of Ilumina Life Management and to another
account in the name of Health Search. From there, these funds were
used for various purposes, including to pay for RODNEY L. YENTZER's
personal expenditures.

43. PMY implemented a standard UDT billing practice by using a
form included in each patient file at every office visit. The medical
providers seeing patients received a form stating, "All Better Wellness
Center Altoona Clinic QUALITATIVE TESTING WITH REFLEXIVE
CONFIRMATION REQUISITION." The provider's name was also typed
in as the "REQUESTING PHYSICIAN." In the section for "Test orders,"
there were two options: the first was "USE Custom Profile (1) Drugs of
Abuse Screen with Reflexive Confirmation"; the second option was
"Alternative Custom Profile." The box for the first option was pre-
checked—meaning medical providers exercised no discretion, and

therefore for each patient a "screen" (i.e., presumptive test) and a "reflexive confirmation" (i.e., confirmatory test) were ordered at each and every visit.

44. RODNEY L. YENTZER and PMY CHIEF EXECUTIVE OFFICER also took over management of other medical practices. For instance, they managed a practice in New Cumberland, Pennsylvania, where S.M, a family medicine specialist, worked.

45. RODNEY L. YENTZER and PMY CHIEF EXECUTIVE OFFICER were repeatedly confronted with information regarding the unlawful nature of the company's UDT billing practices. For instance, in an email on or about July 29, 2017, S.M. sent RODNEY L. YENTZER an email in which he complained about the pressure from PMY CHIEF EXECUTIVE OFFICER to see more patients and bill patients for more lab services, including UDT. S.M. expressed concerns about "ordering urine drug screens every visit on all Suboxone patients just to generate income" because these were "unnecessary tests" and "outside the standard of care." S.M. also raised the risk of "potentially having to pay back moneys for tests declared unnecessary by an outside physician reviewer."

20

46. Approximately one month later, on or about August 28, 2017, PMY CHIEF EXECUTIVE OFFICER wrote to S.M.'s administrative assistant asking, "Did you send urines to us for these pts [i.e., patients]?" The assistant copied S.M. on the email and wrote back to PMY CHIEF EXECUTIVE OFFICER, "Urines were performed on these patients last month. . . . Federal guidelines call for performing urine drug screens every 3 or 4 months and even just once or twice a year on stable patients." Like, S.M., the assistant raised concerns about "unnecessary testing."

47. In August 2017, the number of definitive UDTs that PMY billed under procedure code G0483 increased more than 50% from just the previous month.

48. Around the end of 2018, RODNEY L. YENTZER and PMY CHIEF EXECUTIVE OFFICER entered into a joint venture to acquire management control of PRACTICE GROUP 2. PMY CHIEF EXECUTIVE OFFICER identified this opportunity and brought it to RODNEY L. YENTZER for his financial backing. RODNEY L. YENTZER and PMY CHIEF EXECUTIVE OFFICER agreed with the physicians who owned PRACTICE GROUP 2 that it would send urine

21

samples to PMY's lab for testing. In connection with this joint venture, which generated additional UDT billing, PMY CHIEF EXECUTIVE OFFICER negotiated a profit-sharing agreement with RODNEY L. YENTZER.

49. In or around mid-2019, the billing company held an in-person meeting with RODNEY L. YENTZER and PMY CHIEF EXECUTIVE OFFICER. At this meeting, the billing company asked RODNEY L. YENTZER and PMY CHIEF EXECUTIVE OFFICER what PMY intended to do about its UDT practices, because several insurance companies had raised questions about the medical necessity of PMY's UDTs, starting around the end of 2018. RODNEY L. YENTZER responded that changing PMY's practice of ordering multiple UDTs for each patient at every office visit would put the company out of business. Following this meeting, PMY continued to bill for multiple UDTs for each patient at every office visit.

All in violation of Title 18, United States Code, Section 1349.

THE UNITED STATES ATTORNEY FURTHER CHARGES:

## COUNT 2
18 U.S.C. § 1956(h)
(Conspiracy to Launder Monetary Instruments)

50.   Paragraphs 1 through 33 and 36 through 49 are incorporated here.

51. From in or around 2016 until in or about January 2020, in York County and Cumberland Counties, within the Middle District of Pennsylvania, and elsewhere, the defendant,

**RODNEY L. YENTZER**,

did knowingly conspire and agree, together and with other persons both known and unknown to the United States, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, to wit:

(a)  to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is Title 18, United States Code, Section 1347 (Health Care Fraud), with the intent to promote the carrying on of specified unlawful activity, that is Title 18, United States Code, Section

23

1347 (Health Care Fraud), and that while conducting and

attempting to conduct such financial transaction knew that

the property involved in the financial transaction represented

the proceeds of some form of unlawful activity in violation of

Title 18, United States Code, Section 1956(a)(1)(A)(i); and

(b) To knowingly conduct and attempt to conduct financial

transactions affecting interstate commerce and foreign

commerce, which transactions involved the proceeds of

specified unlawful activity, that is, Title 18, United States

Code, Section 1347 (Health Care Fraud), knowing that the

transactions were designed in whole or in part to conceal and

disguise the nature, location, source, ownership, and control of

the proceeds of specified unlawful activity, and that while

conducting and attempting to conduct such financial

transactions, knew that the property involved in the financial

transactions represented the proceeds of some form of

unlawful activity, in violation of Title 18, United States Code,

Section 1956(a)(1)(B)(i); and

(c) To knowingly engage and attempt to engage, in monetary

24

transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is payments by and through Pain Medicine of York to PHYSICIAN 2, such property having been derived from a specified unlawful activity, that is, Title 18, United States Code, Section 1347 (Health Care Fraud), in violation of Title 18, United States Code, Section 1957.

## MANNER AND MEANS OF THE CONSPIRACY

52. Prior to PHYSICIAN 1's sentencing hearing, PHYSICIAN 1 and RODNEY L. YENTZER agreed to put PHYSICIAN 1's wife ("PHYSICIAN 2")—who was trained as a physician but had not practiced medicine for years—on the payroll of PMY with a salary of approximately $250,000 a year. In addition, they agreed that an employee of PMY would go to the shared home of PHYSICIAN 1 and PHYSICIAN 2 one day a week to perform yardwork and other household duties under the direction of PHYSICIAN 2.

25

53. PHYSICIAN 2 did not perform clinical services at PMY at any time while she was receiving a salary. In order to make it appear that she was performing legitimate work, PHYSICIAN 1 and RODNEY L. YENTZER agreed that PHYSICIAN 2 would periodically send an email to RODNEY L. YENTZER containing summaries and excerpts of medical literature.

54. Following PHYSICIAN 1's imprisonment, PHYSICIAN 2 received payments from PMY, Ilumina Life Management, and Health Search. This arrangement permitted PHYSICIAN 1 to share in the financial success of PMY while he was incarcerated and without his assets being seized by the federal government for purposes of restitution payments.

55. After PHYSICIAN 1 reported to prison, RODNEY L. YENTZER and PHYSICIAN 1 continued to communicate by telephone and through in-person visits. RODNEY L. YENTZER assisted PHYSICIAN 1 in handling various business affairs while PHYSICIAN 1 remained incarcerated. RODNEY L. YENTZER also continued to satisfy numerous financial obligations of PHYSICIAN 1 using the proceeds of PMY.

26

56. On or about January 14, 2020, following the execution of search warrants at PMY's various locations, RODNEY L. YENTZER and PHYSICIAN 1 had a telephone call in which RODNEY L. YENTZER pledged that "if there's anything left, I will make sure [PHYSICIAN 2] gets, uh, a piece." He added that "whatever's left" after satisfying certain creditors he would "divvy up."

All in violation of Title 18, United States Code, Section 1956(h).


THE UNITED STATES ATTORNEY FURTHER CHARGES:

## COUNT 3
18 U.S.C. § 641
(Theft of Public Money, Property, or Records)

57. On or about April 10, 2020, in the Middle District of Pennsylvania, the defendant,

**RODNEY L. YENTZER**,

willfully and knowingly did steal and purloin Provider Relief Funds, of a value exceeding $1,000, distributed to Pain Medicine of York by the U.S. Department of Health and Human Services, of the goods and property of the United States.

All in violation of Title 18, United States Code, Section 641.

27

JOHN C. GURGANUS
United States Attorney


RAVI ROMEL SHARMA                    Date    2/14/2022
Assistant United States Attorney

28